IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

DEBBIE NESBITT,

    Plaintiff,

       v.

UNIVERSITY OF MARYLAND
 MEDICAL SYSTEM, *et al.,*

    Defendants.

          CIVIL NO.: WDQ-13-0125

\* \* \* \* \* \* \* \* \* \* \* \* \*

MEMORANDUM OPINION

Debbie Nesbitt sued the University of Maryland Medical System ("UMMS") and the Baltimore Washington Medical Center, Inc. ("BWMC") (collectively, the "Defendants") for employment discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII")[1] and the Age Discrimination in Employment Act of 1967 ("ADEA"), and breach of contract under Maryland law.[2] Pending are the Defendants' motion for summary judgment and Nesbitt's motion for reconsideration of Magistrate Judge Sullivan's discovery order. No hearing is necessary. Local Rule 105.6 (D. Md. 2014). For the following reasons, the Defendants' motion for summary judgment will be granted in part

---

[1] 42 U.S.C. §§ 2000e, *et seq.*

[2] 29 U.S.C. §§ 621, *et seq.*

and denied in part; Nesbitt's motion for reconsideration will be denied.

I.   Background[3]

A.   Nesbitt's Employment with BWMC

"BWMC is a 310 bed hospital in Glen Burnie, Maryland, employing over 2,800 employees." ECF No. 68, Ex. 2 ("Poehler Aff.") at 4.  In 2000, BWMC became a wholly-owned subsidiary of UMMS.  ECF No. 68, Ex. 3 ("Olscamp Dep.") at 8:1-22.  Although "UMMS's executives are in charge of BWMC and BWMC's Vice Presidents are UMMS employees, BWMC has its own board of directors.  UMMS's board of directors has only 'reserved powers' pertaining to items such as major capital projects and final approval of operating budgets."  ECF No. 68-1 at 14 (citing Olscamp Dep. at 9-10).

On August 5, 1996, BWMC hired Nesbitt[4] as a temporary Human Resources ("HR") Recruiter.  ECF No. 68, Ex. 16 ("Nesbitt Dep.") at 43-44.  Nesbitt was later given a permanent position, but remained "a 32-hour per week exempt employee."  ECF No. 68-1 at

---

[3] The facts are taken from the second amended complaint (ECF No. 29), the Defendants' motion for summary judgment (ECF No. 68), Nesbitt's opposition (ECF No. 72), the Defendants' reply (ECF No. 74), and their supporting exhibits.  In reviewing a motion for summary judgment, the nonmovant's evidence "is to be believed, and all justifiable inferences are to be drawn in [her] favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[4] Nesbitt was born in 1952 and is female.  ECF No. 29 at 3-4.

17.   In her position, Nesbitt "generally recruited for 30-40 positions at a time, for a variety of departments." *Id.* (citing Nesbitt Dep. at 47-52).

From the beginning of Nesbitt's employment until January 8, 2010, Nesbitt was supervised by the Director of Human Resources Services, Pat Loughlin.  Nesbitt Dep. 45:1-46:22.  Loughlin never disciplined Nesbitt, and gave Nesbitt "outstanding" ratings on performance evaluations.[5]  *Id.* at 97, 102; *see also* ECF No. 72, Ex. 2 at 4-7.

B.   Nesbitt's Interactions with Frank Venuto

On May 12, 2008, the Defendants hired Frank Venuto to be the Vice President of HR.  ECF No. 68, Ex. 8.  The Defendants allege that Venuto was hired "to change the culture in the HR Department," and make it more professional.[6]  *See* ECF No. 68-1 at 17-18.  Nesbitt alleges that Venuto created a hostile work

---

[5] The Defendants argue that Nesbitt's performance was deficient under Loughlin, and that Loughlin should have disciplined Nesbitt on several occasions, but failed to do so because Loughlin was Nesbitt's friend.  *See* ECF No. 68-1 at 7, 35-37. This, however, is a factual dispute that the Court cannot resolve on a motion for summary judgment.

[6] The Defendants argue that the animosity between Nesbitt and Venuto was due to Nesbitt's unhappiness with the change in management style.  *See* ECF No. 68-1 at 17-25.

environment for the women of the HR Department, particularly the older women.[7]   *See* ECF No. 72-1 at 24.

Venuto's office was located next to Nesbitt's.   Nesbitt Dep. at 106:10-15.   A few weeks after Venuto began working in the HR Department, Nesbitt noticed that Venuto began treating her "in a more passive manner."   ECF No. 72-1 at 7.   For example, "[w]hen [] Nesbitt would walk over to [] Venuto's office to ask a work-related question, he would ignore her and brush her off in favor of whatever task he happened to be doing at the time."   *Id*.   If Nesbitt was in Venuto's office when he received a phone call, "he would interrupt her to take the call and then not follow up with her."   *Id*.   Venuto also failed to respond to at least a dozen of Nesbitt's "work-related emails." *Id*.

In addition to this "passive" behavior, Nesbitt alleges that Venuto "ma[de] overt attempts to belittle, undermine, and embarrass [] Nesbitt in front of her coworkers."   ECF No. 72-1 at 7.   For example, in either September or October 2008, Venuto asked for a volunteer to lead the staff's "morning huddle." Nesbitt Dep. at 108:13-109:7.   When Nesbitt volunteered, Venuto ignored her and continued to request a volunteer.   *Id*.   Nesbitt

---

[7] At the time of Nesbitt's employment, the HR Department had 21 employees, including 18 females, and 14 people over the age of 40.   *See* ECF No. 68, Ex. 8.   Of the 14 people over the age of 40, 11 were female.   *See id*.

again volunteered, but Venuto selected Benefits Supervisor Charlene Smelter to lead the huddle. *Id.* Smelter was 53 years old. *See* ECF No. 68, Ex. 8.

In another incident at a monthly staff meeting in "the fall of 2008," Nesbitt was seated behind Venuto "while he was standing and presenting at the meeting." ECF No. 72-1 at 8. Ten or fifteen minutes into the meeting, Venuto accused Nesbitt of staring at his butt in front of the entire HR staff. *Id.* Nesbitt "was shocked, embarrassed, and found the comment offensive." *Id.*

Nesbitt also alleges that Venuto's hostile actions occurred at recruitment meetings. The recruiting staff consisted of four female recruiters: Joyce Kroneberger (age 50), Sue Guzinski (age 51), Sue Stein (age 52), and Nesbitt. *See* ECF No. 68, Ex. 8. The recruiting staff had weekly meetings, which Loughlin frequently attended, and Venuto attended "on occasion." Nesbitt Dep. at 118:12-120:22. On seven to ten occasions at these meetings, Venuto would interrupt Nesbitt's presentations by putting his hand up to cut her off, telling her to "cut to the chase," or saying "Debbie, you're killing me." *Id.* Nesbitt testified that he "[n]ever" treated other people at recruitment

meetings this way.  *Id.*  Nesbitt also testified that Venuto "really didn't care for [her]."[8]  *Id.* at 108:1-22.

In "late 2008 [to] early 2009," Nesbitt alleges that "Venuto's conduct toward [her] became increasingly aggressive and intimidating."  ECF No. 72-1 at 8.  For example, Venuto yelled at Nesbitt in his office over a payroll issue because he claimed that she did not understand what it meant to be an exempt employee.  Nesbitt Dep. at 121:10-127:22.  The next day, Venuto, Nesbitt, and Loughlin met about the incident.  *Id.* Venuto again yelled at Nesbitt, and told her that Karen Olscamp, BWMC's President and CEO, had "tasked" Venuto with firing Nesbitt.  *Id.*

In May 2009, the HR Department moved to a new office space. ECF No. 72-1 at 8.  Before the move, Venuto sent the staff a memorandum stating that no one could move personal belongings to the new space until the official move-in day.  Nesbitt Dep. at 74:1-81:15.  At the staff meeting on the first day in the new office, Venuto screamed at the entire staff because some people had moved in their belongings early.  *Id.*  Loughlin, Kathy

---

[8] The Defendants argue that Venuto did not have any problem with Nesbitt personally.  In support of this argument, the Defendants supplied several emails from Venuto to Nesbitt in which he praised her performance or showed concerns over Nesbitt's health.  *See* ECF No. 68-1 at 38-39; ECH No. 68, Exs. 43-44.

Pohler,[9] Betsy Tabor,[10] and Guzinski told Venuto that they had moved their items early. *Id.* Venuto yelled at them and ordered them to schedule a time to meet him for punishment.[11] *Id.*

Nesbitt described Venuto's conduct as a "tirade" and "intimidating." *Id.* Some staff members started crying. *Id.* Later, Venuto issued written warnings to Loughlin, Poehler, and Tabor for violating his memorandum instructions. ECF No. 68, Ex. 17 ("Venuto Dep.") at 110:1-113:22, 128:1-22, 130:1-131:22. Venuto did not punish Guzinski because she explained that she only moved her items because she saw her supervisor, Loughlin, doing so.[12] *See id.*

---

[9] Poehler was the Director of Human Resources Services and was 67 years old. *See* ECF No. 68, Ex. 8.

[10] Tabor was an office assistant and was 69 years old. *See* ECF No. 68, Ex. 8.

[11] Nesbitt alleges that Venuto's actions were "quite suspicious" because allegedly his secretary previously told a few staff members that they could move their personal items to the new office early. *See* ECF No. 72-1 at 9.

[12] Nesbitt also alleges that a male employee--Keith Peron (age 46--and a younger female employee--Syma Rizvi (age 26)--were not punished despite moving their items early. *See* ECF No. 72-1 at 9.
   Unlike the other individuals, Rizvi did not volunteer at the meeting that she had moved items early. Rizvi only told Venuto later, and he stated that he did not "care," but was upset that she did not listen to him." ECF No. 72, Ex. 4 ("Rizvi Dep.") at 62:1-64:22. It is unclear from Rizvi's testimony when she told Venuto about her actions. *See id.*
   Peron did not move personal items in violation of Venuto's instructions; he helped maintenance move new equipment. 81:1-

After Venuto's "tirade" about the move, Nesbitt allegedly began having health problems because of the stress at the office. *See* ECF No. 72-1 at 10. Nesbitt visited Syma Rizvi, the Employee Occupational Health Physician's Assistant, for her health problems, and "sought the consult" of Peggy Burns, a mental health counselor available to all of the Defendants' employees.[13] *Id.*

Between June and August 2009, Nesbitt was on FMLA leave "due in part to [her] heightened blood pressure and stress related symptoms." ECF No. 72-1 at 11. When Nesbitt returned from leave, she alleges that "the work environment was no better." *Id.* at 12. Nesbitt alleges that "[i]f a male employee asked a question during a meeting, [] Venuto would treat the question as a legitimate question and respond professionally, while the opposite was true if [] Nesbitt or a female employee asked a question." *Id.* However, when questioned for specific

---

83:11. Further, there is no evidence that Venuto ever knew of Peron's actions. *See id.*

[13] During the relevant time period, Burns treated five women and one man from HR. ECF No. 72, Ex. 6 at 44:1-53:1. Rizvi was also "bombarded" by employees. Rizvi Dep. at 22:21-23:22. Rizvi recalled treating approximately six employees from HR, all of whom were women and most of whom were over 40 years old. *Id.* at 153:4-17. Nesbitt attempts to rely on hearsay statements made by these anonymous patients to Rizvi and Burns to bolster her hostile work environment claim. However, these hearsay statements are inadmissible, and are not evidence that the Court may consider on a motion for summary judgment.

examples, Nesbitt provided one time in which Venuto did not "seem offended" when Dan Neal[14] asked about a "legitimate question" about "the HRIS" system, compared to when Venuto requested that Nesbitt smile when she was decorating a "little tropical tree."  Nesbitt Dep. at 331:1-332:3.  Other HR employees agreed with Nesbitt that Neal and James Uhrich[15] were treated differently from other staff members, and claimed that women were treated differently in comparison to Neal and Uhrich. However, when questioned for specific examples, these individuals could rarely provide specific dates and times, and when questioned further, admitted that Venuto also treated Keith Peron, the only other male in the office, badly.  *See Kroneberger Dep.* at 63:1-22; Peron Dep. 17:22-18:8, 25:12-14; Tabor Dep. 40:10-47:18 (stating that Venuto ordered women around, but would make "requests" to Neal, but later admitting that Venuto would order around Peron).

On October 12, 2009, Nesbitt filed a corporate complaint ("CC") against Venuto.  ECF No. 72, Ex. 9.  In the CC, Nesbitt stated that she had "grave concerns over the decisions and actions [Venuto] ha[d] taken," and asserted that some actions did "not fit labor law guidleines."  *Id.* at 1.  Nesbitt than

---

[14] Daniel Neal was the Human Resource Identification System Manager and was 29 years old.  ECF No. 68, Ex. 8.

[15] Uhrich was a compensation analyst and was 48 years old.  ECF No. 68, Ex. 8.

detailed every action by Venuto with which she disagreed in eight, single-spaced pages. *Id.* In one section titled "EEOC/Age Discrimination," Nesbitt alleged that Venuto "Targets the older members of the staff, i.e. Betsy [Tabor], Pat [Loughlin], Kathy [Poehler], and [Nesbitt]." *Id.* at 7.

UMMS's in-house counsel, Sandra Benzer, Esq. (age 45), and General Counsel, Megan Arthur, Esq. (age 47), conducted an investigation of Venuto based on the CC. ECF No. 72-1 at 12. Benzer and Arthur concluded their investigation in December 2009. *Id.* They informed Nesbitt that although they did not agree with Venuto's management style, they found no evidence of illegal discrimination. *Id.* Nesbitt informed them that she "really didn't want to have to take this outside of the hospital," and "was considering talking with [the] EEOC." *Id.* After their meeting with Nesbitt, Benzer and Arthur reported their findings to Olscamp, including their finding that the HR Department was "not functioning at an acceptable level." Arthur Dep. at 17:1-19:22.

After the investigation, "Venuto [allegedly] continued to embarrass [] Nesbitt at meetings and address her 'condescending-ly' and in an 'insulting' manner." ECF No. 72-1 at 13. As an example, Nesbitt testified that she had asked Venuto for a bulletin board before the investigation, but he stated there was no money in the budget for a bulletin board. Nesbitt Dep. at

254:6-256:22.  After the investigation, Nesbitt was having trouble with her computer mouse, but did not request a replacement because of the bulletin board incident.  *Id*.  At the first staff meeting after Loughlin's retirement, Venuto asked Nesbitt why she had not come to him to get a new mouse, and informed Nesbitt that he had sent Neal to her office to replace her mouse.  *Id*.

C.   Complaints about Nesbitt and Her Termination

Before Nesbitt filed her CC, Venuto removed two hospital departments from Nesbitt's recruitment portfolio.  See ECF No. 68-1 at 35.  Sometime after Venuto began working in the HR Department, Vice President for Development Beth Peters went to Venuto and requested a new recruiter based on Nesbitt's performance.  *See id*. at 35-37.  Venuto removed Nesbitt from Peters's department and assigned Stein as the department's recruiter.  *Id*.  Venuto received similar complaints about Nesbitt from Vice President for Quality, Mary Jozwik, and reassigned Jozwik's department to Kroneberger.  *Id*.  In addition to Venuto, Olscamp was aware of Peters's and Jozwik's problems with Nesbitt.  *See id*.

In January 2010, after the conclusion of the CC investigation, Olscamp received another complaint about Nesbitt. While Nesbitt was on bereavement leave for the death of her mother, she received an email from Senior Vice President for

11

Business Development Kathy McCollum (age 42).  *See* ECF No. 72-1

at 14.  On December 30, 2009, McCollim had "learned a candidate

decided not to take a job and that the individual had previously

contacted [] Nesbitt to advise of the decision."  ECF No. 68-1

at 39.  McCollum wrote to Nesbitt, expressing her condolences

over Nesbitt's mother's death, but asked why Nesbitt did not

have an "out of the office" message on her work email account.[16]

*See* ECF No. 68-1 at 39; ECF No. 68, Ex. 45.  Nesbitt found

McCollum's email "suspicious" and was upset because "a similar

interaction had occurred with [] McCullum when [] Nesbitt's

mother-in-law passed away several years prior . . . ."  ECF No.

72-1 at 14.

On January 4, 2010, Nesbitt sent an email to McCollum.  In

the email, Nesbitt explained why she had not responded to the

candidate.  ECF No. 68, Ex. 45.  She also wrote the following:

> Once again I find that you are making an
> accusation of me being derelict in my job duties
> without knowing any of the facts.  I would have
> appreciated you giving me the benefit of the doubt and
> asked what the circumstances were regarding [the
> candidate].

> Kathy, this is not the first time you have
> accused me of something I did not do at the time of a
> death in my family.  The first time was last year when
> my mother-in-law died and now my mother.  Same kind of
> scenario in Mary Lanham's department.  I had requested
> at the time a meeting with you to discuss your

---

[16] Nesbitt asserts that she never received the candidate's email
"because it was rejected by BWMC's email spam gateway."  ECF No.
72-1 at 14.

concerns and you never responded or asked to meet with me.   I sent an email and left a message with Susan with no response.

It saddens me that anyone could send such a heartless and insensitive email without regard for our family's loss or the facts involved in the situation.

ECF No. 68, Ex. 45.[17]

Within hours of Nesbitt's email, McCollum responded, apologizing if Nesbitt thought the prior email was insensitive and explaining why she thought the issue was a priority.[18]  *See* ECF No. 68, Ex. 45.  The next day, Nesbitt responded to McCollum and Venuto by saying, "I consider this to be an inappropriate response.  End of me trying."  *Id.*  Nesbitt also sent McCollum an individual email which only said, "Here you go!"  *Id.* McCullom found the whole exchange "pretty insubordinate" and forwarded the last email to Venuto, and Venuto forwarded the full series of emails to Olscamp.  *Id*; McCullom Dep. at 85:1-88:22.  On January 6, 2010, McCullom requested a new recruiter for her department.  ECF No. 68, Ex. 46.

---

[17] Nesbitt also sent an email to Olscamp, in which she stated, "unfortunately this feel[s] like retaliation to me."  ECF No. 68, Ex. 45.

[18] Venuto was copied on the email.  *See* ECF No. 68, Ex. 45.

On January 21, 2010, Nesbitt received an email from Olscamp
praising Nesbitt's performance and giving her a raise.[19]   ECF No.
72, Ex. 31.  On January 22, 2010, Nesbitt emailed UMMS President
and CEO Robert Chrencik.  ECF No. 68, Ex. 36.  In the email,
Nesbitt mentions her prior CC and the investigation into
possible EEOC violations.  *Id.*  She also stated that Venuto's
"behavior ha[d] not changed," and requested Chrencik's
assistance.  *Id.*  Arthur was copied on the email.[20]  *Id.*

On January 27, 2010, Olscamp terminated Nesbitt.  Nesbitt
Dep. 12:12-15.  The Defendants assert that Nesbitt was not
terminated because of her CC or the email to Chrencik.  ECF No.
68-1 at 44-45.  According to the Defendants, Olscamp made the
decision to fire Nesbitt "approximately two weeks prior to her
actual termination," and only read Nesbitt's email to Chrencik
just prior to her deposition.  *Id.*  Olscamp asserts that Nesbitt
was terminated because "[s]he had become disruptive, she was
challenging routine management decisions, she was challenging
senior vice presidents in what I considered an inappropriate
manner, and I believed it was in the best interest of the
organization that she no longer be employed."  Olscamp Dep. at

---

[19] The Defendants argue that the letter was a form letter and
"probative of nothing."  ECF No. 74 at 27-29.

[20] The Defendants' Privilege Log shows that Arthur sent Olscamp
and email that same day.  *See* ECF No. 72-1 at 14; ECF No. 72,
Ex. 16.

18:1-19:22.  Nesbitt, however, alleges that Olscamp told her
that she was being terminated because of her harassment
complaints.[21]  Nesbitt Dep. at 12:16, 13:7, 16:8-12.

Nesbitt alleges that her termination violated BWMC's
written progressive discipline policy because Nesbitt had not
received any prior warnings or other disciplinary steps, and
that this was the first time in years that BWMC had not applied
the policy in a case other than egregious employee misconduct.
ECF No. 72-1 at 36-38.  BWMC's Corrective Action Policy states
that it is only "intended as a guide for dealing with the
improvement of [] performance or disciplinary concern.  It is
not a substitute for independent judgment and prudent action.
Depending upon the seriousness of the offense, steps in the
corrective action process may be repeated, bypassed or the time
span between steps adjusted."  ECF No. 68, Ex. 4.  The Policy
also states that "the hospital retains its right to terminate an
employee at any time without notice and without cause."  *Id.*
BWMC's Employee Handbook also states that employees can be
terminated at any time and that the Handbook was "not intended
to set forth express or implied contractual obligations."  ECF
No. 68, Ex. 5 at 6, 36-37.

---

[21] When Nesbitt filed for unemployment, she stated that she did
not know why she was terminated and that no one had given her a
reason.  Nesbitt Dep. at 226:1-227:22.

D.    Other Employees

Nesbitt alleges that other HR Department employees "observed a hostile work environment based on age and gender." ECF No. 72-1 at 16.

First, Nesbitt cites the testimony of Rizvi.  Rizvi testified in a conclusionary fashion that Venuto was nicer to younger employees compared to older employees, but did not provide specific examples.  *See* ECF No. 72-1 at 17; Rizvi Dep. at 20:1-22:22.  On one occasion, Venuto came to Rizvi to speak with her about whether some employees could meet the physical requirements of their jobs.  Venuto also suggested mandatory fit testing.  Rizvi considered these employees "a little elderly" and thought that Venuto might be looking for a reason to fire them.  Rizvi Dep. at 21:1-22.  On another occasion, Rizvi heard Venuto say that the office had "too much estrogen."[22]  Rizvi Dep. at 90:4-18.

Nesbitt also cited the testimony of Neal, Kroneberger, Peron, and Tabor.  Neal only stated that he never felt embarrassed by Venuto, and that Venuto had denied him supplies in the past based on budgetary concerns.  ECF No. 72, Ex. 21 ("Neal Dep.") at 92:1-93:22.

---

[22] Neither Nesbitt nor any other HR employee heard this comment.

16

Kroneberger stated on several occasions that Venuto did not have respect for older female employees, and tended to bully Nesbitt.  Kroneberger Dep. at 58:19-59:9, 153:4-154:7, 194:9-196:7.  However, she failed to provide specific examples and stated that "control, hostility, and disregard ha[d] become the norm" for the *entire* HR Department, and also testified that she "didn't ever think of it so much as a women-against-men thing." *Id*. at 154:8-15, 197:3-8.

Peron testified that Venuto tended to be argumentative and confrontational with everyone who questioned his authority no matter their age.  Peron Dep. at 25:12-14.  Peron felt that Venuto was dismissive toward women at meetings, but admitted that Venuto only got along with Ulrich and Neal and also tended to treat Peron dismissively.  *See id*. at 16:18-19:8, 30:21-32:21.

Like Peron, Tabor also conclusionarily stated that Venuto treated older females differently.  Tabor Dep. 33:3-22, 40:10-43:22.  However, whenever asked for examples, Tabor admitted that Peron was also treated poorly.  *Id*. at 47:20-48:2.  For example, Tabor stated that Venuto tended to "order" female employees to complete a task, but "requested" Neal to complete tasks.  *Id*. at 40:10-44:18.  Unlike Neal, Peron was "ordered" like the female employees.  *Id*.  Tabor also testified that

17

Venuto would interrupt her by putting his hand in her face; however, she saw him do the same to Peron.  *Id*. at 60:7-61:5.

   E.   Procedural History

   On June 2, 2010, Nesbitt filed a charge with the EEOC against BWMC and UMMS, and, on June 29, 2012, received her right to sue letter.  *See* ECF No. 2-1.  On September 21, 2012, Nesbitt filed suit in the Circuit Court for Anne Arundel County, Maryland alleging (1) hostile work environment (against UMMS and BWMC), (2) disparate discipline (UMMS and BWMC), (3) retaliation (UMMS and BWMC), (4) breach of contract (BWMC), (5) intentional infliction of emotional distress (Venuto), (6) *respondeat superior* intentional infliction of emotional distress (UMMS and BWMC), and (7) abusive discharge (UMMS and BWMC).  ECF Nos. 2, 18.  On January 11, 2013, the Defendants removed to this Court. ECF No. 1.

   On December 6, 2013, the Court dismissed all of Nesbitt's claims except her claim for hostile work environment, retaliation, and breach of contract.  ECF Nos. 24-25.  On January 3, 2014, Nesbitt filed an amended complaint including only the remaining claims.  ECF No. 29.

   On August 15, 2014, Nesbitt moved for sanctions, which was referred to Magistrate Judge Timothy J. Sullivan.  ECF No. 56. On September 22, 2014, the Defendants moved for summary

judgment.[23]   ECF No. 68.   On October 9, 2014, Nesbitt opposed the motion.   ECF No. 72.   On October 24, 2014, the Defendants replied.   ECF No. 74.

On October 19, 2014, Judge Sullivan denied Nesbitt's motion for sanctions.   ECF No. 75.   On November 12, 2014, Nesbitt moved for reconsideration.   ECF No. 77.   On November 25, 2014, the Defendants opposed the motion.   ECF No. 78.   On December 12, 2014, Nesbitt replied.   ECF No. 79.

## II.   The Defendants' Motion for Summary Judgment

### A. Legal Standard

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).[24]   In considering the motion, the judge's function is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."   *Anderson*, 477 U.S. at 249.   A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Id.* at 248.

---

[23] The Defendants also moved to seal two of their summary judgment exhibits.   ECF No. 70.   The Court will grant the motion.

[24] Rule 56(a), which "carries forward the summary-judgment standard expressed in former subdivision (c)," changed "genuine 'issue' [to] genuine 'dispute,'" and restored the word "'shall' . . . to express the direction to grant summary judgment."   Fed. R. Civ. P. 56 advisory committee's note.

The Court must "view the evidence in the light most favorable to
. . . the nonmovant and draw all reasonable inferences in [her]
favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d
639, 645 (4th Cir. 2002), but the Court must abide by the
"affirmative obligation of the trial judge to prevent factually
unsupported claims and defenses from proceeding to trial,"
*Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526
(4th Cir. 2003) (citation and internal quotation marks omitted).

B. Nesbitt's Hostile Work Environment Claims

Title VII prohibits an employer from discriminating against
an employee because of sex.  42 U.S.C. § 2000e-2(a)(1).  Under
the ADEA, an employer may not "discharge any individual or
otherwise discriminate against any individual with respect to .
. . privileges of employment, because of such individual's
age."  29 U.S.C. § 623(a)(1).  A plaintiff may plead a hostile
work environment claim under these statutes.[25]

---

[25] *See, e.g.*, *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167,
174 (4th Cir. 2009); *Baqir v. Principi*, 434 F.3d 733, 746 n.14
(4th Cir. 2006) (noting that hostile work environment claims are
cognizable under Title VII and assuming, without deciding, that
a plaintiff aged 40 or older may bring a hostile work
environment claim under the ADEA); *see also Graham v. Prince
George's County*, 191 Fed. App'x. 202, 204 (4th Cir. 2006)
(deciding the merits of an ADEA hostile work environment claim).

To survive summary judgment on a claim for a sex or age-based hostile work environment, a plaintiff must show that the offending conduct was: (1) unwelcome;[26] (2) based on sex or age; (3) subjectively and objectively severe or pervasive enough to alter the plaintiff's conditions of employment and create an abusive atmosphere; and (4) imputable to the employer.[27] *See Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 183-84 (4th Cir. 2001); *Baqir,* 434 F.3d at 745-46; *Alston v. N. Carolina A & T State Univ.,* 304 F. Supp. 2d 774, 779 (M.D.N.C. 2004). The Defendants argue that Nesbitt has failed to establish the second and third elements of her hostile work environment claims. ECF No. 68-1 at 47.

To establish the second element--that the conduct was based on age or sex--Nesbitt must show that "but for" her age or sex,

---

[26] An employee's complaint about the offending conduct indicates that she found it unwelcome. *See E.E.O.C. v. Sunbelt Rentals, Inc.,* 521 F.3d 306, 314 (4th Cir. 2008). Nesbitt alleged that she made several complaints about Venuto's conduct. Thus, she has sufficiently established this element. *See Sunbelt Rentals,* 521 F.3d at 314; *Smith v. First Union Nat. Bank,* 202 F.3d 234, 242 (4th Cir. 2000).

[27] A hostile work environment is imputable to the employer if supervisors knew about the offending conduct but failed to "respond with remedial action[.]" *Sunbelt Rentals,* 521 F.3d at 319. Nesbitt alleged that BWMC did not take any corrective action after they investigated her complaint against Venuto; instead, they discouraged her from further pursuing her complaint. *See* ECF No. 18 ¶¶ 29, 34. Thus, she has sufficiently established this element. *See Sunbelt Rentals,* 521 F.3d at 319.

she "would not have been the victim of the alleged discrimination." *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998); *Hartsell v. Duplex Products, Inc.*, 123 F.3d 766, 772 (4th Cir. 1997). Sex-based or age-based animosity can be shown by direct evidence of discrimination, or differential treatment of similarly situated younger or male employees. *See Gilliam*, 474 F.3d at 142; *Causey*, 162 F.3d at 801-02.

"[H]arassment due to personality conflicts will not suffice. Some persons, for reasons wholly unrelated to [age] or gender, manage to make themselves disliked." *Ziskie v. Mineta,* 547 F.3d 220, 226 (4th Cir.2008). "Therefore, in order to survive summary judgment, there must be sufficient evidence for a reasonable jury to conclude that the alleged harassment stemmed not from personal animosity, workplace competition, or general boorishness, but rather from [discriminatory animus." *Phillips v. Raytheon Applied Signal Tech., Inc.*, No. ELH-11-3230, 2013 WL 5440802, at *19 (D. Md. Sept. 27, 2013).[28] "To be sufficient, the evidence must consist of more than speculation, circumstantial evidence, and 'conclusory' or 'general'

---

[28] "[A] trier of fact may reasonably find discrimination when 'a female victim is harassed in such sex-specific and derogatory terms ... as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace.'" *Hoyle v. Freightliner, LLC,* 650 F.3d 321, 336 (4th Cir. 2011) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

statements—the plaintiff's evidence must prove a direct or inferential connection between the plaintiff's allegations and her [gender and age] supported by specific evidence." *Cepada v. Bd. of Educ. of Balt. Cty.*, 974 F. Supp. 2d 772, 784 (D. Md. 2013) (quotation omitted). "General allegations of differential treatment must be substantiated by 'accounts of specific dates, times or circumstances.'" *Id.* (quoting *Carter v. Ball,* 33 F.3d 450, 461–62 (4th Cir.1994)).

Nesbitt does not make it entirely clear in her filings the particular actions by Venuto that comprise her hostile work environment claim because she continually states that the facts in her opposition are only examples of a "pattern" of conduct. *See* ECF No. 72-1 at 9. However, the Court is not required to comb through the expansive record and make Nesbitt's case for her.[29] Therefore, based on the facts provided by the parties viewed in the light most favorable to Nesbitt, there are three basic sets of allegations supporting her hostile work environment claim: Venuto's "passive" discrimination,[30] his actions in front of others "belittling" or "condescending to"

---

[29] *See, e.g., Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998).

[30] Venuto's "passive" discrimination consists of ignoring approximately a dozen of Nesbitt's emails over the course of eighteen months, ignoring Nesbitt when she entered his office, and interrupting Nesbitt to take phone calls.

Nesbitt,[31] and his aggressive office behavior.[32]  The majority of
these allegations cannot, as a matter of law, support
plaintiff's hostile work environment claim.  Moreover, the
allegations that remain are insufficient to support a finding
that the harassment was sufficiently "severe and pervasive" so
as to trigger liability.

The only allegation about Venuto's behavior that is
directly connected to Nesbitt's gender is his comment during a
staff meeting that she was looking at his butt.  For the
remaining allegations, Nesbitt relies on comparing Venuto's
treatment of her to his treatment of other HR employees.
However, in two instances, Nesbitt concedes that Venuto treated
people inside her protected classes well[33] and simply "didn't
care for [her]."  Nesbitt Dep. at 108:1-22.  For example, when

---

[31] These allegations include Venuto ignoring Nesbitt when she
volunteered to lead the morning huddle, his comment about
Nesbitt staring at his butt, cutting Nesbitt off during
recruitment meetings, and the conversation they had at a staff
meeting about Venuto replacing Nesbitt's computer mouse.

[32] Nesbitt's allegations of Venuto's "aggressive" behavior
include his yelling at her twice over a payroll issue, and his
reaction to the office move.

[33] See Smyth-Riding v. Science and Eng'g Servs., Inc., No. WDQ-
11-0558, 2014 WL 4899573, at *8 (D. Md. Sept. 29, 2014)
(granting summary judgment because the comparator group included
members of the protected class); Allen v. Dorchester Cnty., No.
ELH-11-01936, 2013 WL 5442415, at *15 (D. Md. Sept. 30, 2013)
("If plaintiff's comparators are from the same protected class,
then any discrepancy in discipline is not attributable to
plaintiff's membership in that class.").

Venuto ignored Nesbitt volunteering to lead the morning huddle, he chose Benefits Supervisor Charlene Smelter instead, a female employee who was *older* than Nesbitt.

Similarly, Nesbitt complained about Venuto cutting her off at recruitment meetings, putting his hand in her face, and saying "you're killing me." However, she stated that he did not treat anyone else at recruitment meetings in this manner, and all of the HR recruiters were women over the age of 40. Further, Tabor testified that she saw Venuto cut off Peron--a male employee--by putting his hand in Peron's face.

Nesbitt spends a significant portion of her opposition detailing the events surrounding the office move and Venuto screaming at staff members for moving their personal items early. Venuto, however, yelled at the entire staff, and Nesbitt was not one of the individuals punished. Nesbitt "cannot base a claim of hostile work environment based on discrimination that others suffered." *Cepada*, 974 F. Supp. 2d at 786-87.[34]

At most, the "move meeting" incident may be used by Nesbitt to infer Venuto's discriminatory animus toward Nesbitt in

---

[34] *See also Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 190-91 (4th Cir. 2004) ("[A]n individual plaintiff in a private, non-class action alleging employment discrimination is not litigating' common questions of fact, but the discrete question of whether the employer discriminated against the plaintiff in a specific instance." (*quoting Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 761 (4th Cir. 1998))).

committing what, on their face, appeared to be neutral acts--for example, ignoring Nesbitt's emails.  However, in this regard, Nesbitt's description of the move meeting also fails because Venuto did not punish Guzinski, a 51 year old woman and member of the protected classes, for moving her personal items early.

All of Nesbitt's remaining allegations are gender and age neutral on their face.  Nesbitt tries to support discriminatory animus for these claims by citing conclusionary allegations by herself and others that men were treated differently by Venuto and that Venuto was prejudiced against older women.[35]  Such allegations are not sufficient to establish discriminatory animus.  *Cepada*, 974 F. Supp. 2d at 784 ("General allegations of differential treatment must be substantiated by accounts of specific dates, times or circumstances."); *see also Carter v. Ball,* 33 F.3d 450, 461-62 (4th Cir. 1994) (deposition testimony of a witness stating that he witnessed discrimination without providing specific examples was insufficient evidence to survive summary judgment).  Moreover, several of the witnesses cited by Nesbitt admitted that Peron was also treated poorly and that Venuto had a poor attitude toward the entire department except for Neal and Uhrich.

---

[35] The only specific example given by Nesbitt was an instance in which Venuto answered a question by Neal and did not seem annoyed, compared to Venuto asking Nesbitt to smile when he saw her decorating a tree.

At most, Nesbitt's allegations establish that Venuto was a poor manager who had a friendship with two of his employees and treated all other employees poorly or that Venuto had a personal dislike for Nesbitt.  No reasonable jury could conclude that but-for Nesbitt's age and gender she would have been treated differently.  *See Combs-Burge v. Rumsfeld,* 170 Fed. App'x. 856, 862 (4th Cir. 2006) ("[A]lthough [plaintiff] alleges that [her supervisor] was more friendly to white employees than to her, general complaints of rude treatment are not sufficient to sustain a hostile work environment claim.").  However, even if the facts supported the second element of Nesbitt's hostile work environment claim, she has still failed to establish the third element.

In determining whether the offending conduct was sufficiently severe or pervasive to alter a plaintiff's employment conditions and create an abusive environment, a court may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Sunbelt Rentals*, 521 F.3d at 315.  A plaintiff must show more than simple teasing, offhand remarks, and isolated incidents (unless "extremely serious").  *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L.Ed.2d 662 (1998).  "[A] jury

27

must be able to find that a *reasonable person* would have found the harassment so severe and pervasive as to alter the terms and conditions of employment." *Phillips*, 2013 WL 5440802, at *20.

Nesbitt has alleged that over the span of 18 months, Venuto yelled at her on two occasions about a payroll issue, did not select her once to lead a morning huddle, cut her off at recruitment meetings, ignored a dozen emails(while praising her in others), and interrupted their discussions to answer the phone. The "severe and pervasive" inquiry is not "a mathematically precise test," and is often a question for the jury.[36] However, "the sporadic and largely gender [and age] neutral comments" alleged "even when paired" with the allegations of Tabor, Peron, Rizvi, and Kroneberger, "do not meet the high bar required to proceed with a hostile work environment claim . . . ." *Phillips*, 2013 WL 5440802, at *24. The harassment alleged by Nesbitt was far less frequent and severe than many of the cases that have survived summary judgment in this Circuit.[37]

---

[36] *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-23 (1993).

[37] *See, e.g., Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 336 (4th Cir. 2010) ("constant use of sexist language and disparaging remarks about women," causing plaintiff to "regularly leav[e] work in tears"); *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 174-76 (4th Cir. 2009) (workplace permeated with "habitual" use of epithets, pornography, and dolls hanging by nooses); *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008) (harassment was "persistent, demeaning,

Accordingly, the Court will grant summary judgment for the Defendants on the hostile work environment claims.

C. Nesbitt's Retaliation Claim

A plaintiff can prove her employer's retaliatory conduct through one of two methods. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004). First, she may use "any direct or indirect evidence relevant to and sufficiently probative of the issue," under "ordinary principles of proof." *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (internal quotation marks omitted). To avoid summary judgment, the plaintiff must produce "direct evidence of a stated purpose to [retaliate] and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (alteration in original) (internal quotation marks omitted).

Absent direct evidence of retaliation, the Court applies the burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, the plaintiff must first establish a prima facie case of retaliation. *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir.

---

unrelenting, and widespread"); *Jennings v. Univ. of North Carolina*, 482 F.3d 686, 697 (4th Cir. 2007)(defendant engaged in constant, open discussion of his sexual fantasies and the sex lives of the plaintiff and her teammates).

2010).  If she does, "a presumption of illegal discrimination"
arises, and the burden of production shifts to the employer to
articulate a nondiscriminatory reason for its adverse decision.
*Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011).
"If the defendant carries this burden of production, the
presumption raised by the *prima facie* case is rebutted," *Tex.
Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981), and
the *McDonnell Douglas* framework "drops out of the picture." *St.
Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).  The
plaintiff must then prove by a preponderance of the evidence
that "the proffered reason was not the true reason for the
employment decision," and that the true reason was retaliation.
*Burdine*, 450 U.S. at 256.  She may do this directly or
indirectly, by "persuading the court that a [retaliatory] reason
more likely motivated the employer" or by showing that the
employer's explanation is "unworthy of credence."  *Id.*

    To state a *prima facie* retaliation claim under Title VII or
the ADEA, the plaintiff must show: (1) protected activity; (2)
"materially" adverse employment action;[38] and (3) a causal
connection between the protected activity and materially adverse
action.  *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53,

---

[38] Termination of employment is a materially adverse employment
action.  *See, e.g., Gibson v. Marjack Co., Inc.*, 718 F. Supp. 2d
649, 655 (D. Md. 2010).

68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006); *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 543 (4th Cir. 2003); *Johnson v. Mechanics & Farmers Bank*, 309 F. App'x 675, 684 (4th Cir. 2009).

A "materially" adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington,* 548 U.S. at 68, 126 S. Ct. 2405; *see also Harman v. Unisys Corp.*, 356 Fed. Appx. 638, 641 (4th Cir. 2009). If the employer takes the action "shortly after" learning about the protected activity, courts may infer a causal connection between the two. *Price v. Thompson,* 380 F.3d 209, 213 (4th Cir. 2004).

The Defendants argue that Nesbitt's email to Chrencik was not protected activity.[39] ECF No. 68-1 at 53. There are two categories of protected activity -- opposition and participation. *Laughlin v. Metro. Wash. Airports Auth.,* 149 F.3d 253, 259 (4th Cir. 1998). Participation includes "making a charge, testifying, assisting, or participating in an investigation, proceeding, or hearing." *Betof v. Suburban Hosp.*, No. DKC-11-1452, 2012 WL 2564781, at *10 (D. Md. June 29, 2012). Opposition is a much broader category and includes "staging informal protests and voicing one's own opinions in

---

[39] For the purposes of this motion, the Defendants conceded that Nesbitt's CC was protected activity.

order to bring attention to an employer's discriminatory activities,"[40] or "complain[ing] to [] superiors about suspected violations . . . ."[41]

Nesbitt's email to Chrencik requested his help, mentioned the prior CC and investigation, and referenced the EEOC.  The Defendants have not explained how the original CC can constitute protected activity, but a subsequent email referencing the CC is somehow not protected activity.  There are sufficient facts for a reasonable jury to determine that Nesbitt's email opposed Venuto's allegedly discriminatory actions.  *See Gibson v. Marjack Co.*, 718 S. Supp. 2d 649, 654 (D. Md. 2010) ("[T]he opposition clause protects a wide range of activities, including unofficial protests and the use of informal grievance procedures . . . .  Thus, an employee's comments to an employer complaining about discriminatory practices constitute opposition . . . ."); *see also EOC v. Navy Fed. Credit Union*, 424 F.3d 397, 407-08 (4th 2005).

---

[40] *Laughlin,* 149 F.3d at 259.

[41] *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 543-44 (4th Cir. 2003).

The Defendants also argue that Nesbitt has failed to show a causal nexus between her termination and the protected activity.[42]  Unlike substantive discrimination claims that only require that discriminatory animus be a motivating factor,[43] the plaintiff in a retaliation suit must establish that the adverse employment action would not have occurred absent the protected activity.[44]  A plaintiff can carry this burden by showing "close temporal proximity between the time her employer learned about her protected activity and her discharge . . . ."  *Hubbard v. Ga. Farm Bureau Mut. Ins. Co.*, No. 5:11-CV-290 (CAR), 2013 WL 3964908, at *1 (M.D. Ga. July 31, 2013); *see also Foster v. Univ. of Md. E. Shore*, No. TJS-10-1933, 2013 WL 5487813, at *5-6 (D. Md. Sept. 27, 2013).

In this case, there were only five days between Nesbitt's email to Chrencik and her termination.  Olscamp asserts that she made the decision to terminate Nesbitt weeks before, and the email played no role in the decision; however, this is an issue of fact that the Court cannot resolve on a motion for summary

---

[42] The Defendants assert that temporal proximity alone is not sufficient because the CC occurred three months before Nesbitt's termination.  ECF No. 68-1 at 45.  The Defendants failed to address any arguments relating to Nesbitt's email after arguing that it was not protected activity.  *Id.*

[43] *See Hill*, 354 F.3d at 297-98.

[44] *See Univ. of Tex. Sw. Med. Ctr. V. Nassar*, 133 S. Ct. 2517, 2533 (2013).

judgment.   In addition to her temporal proximity argument,

Nesbitt has cited Olscamp's statements that one of the reasons

Nesbitt was fired was because of her opposition to Venuto.

Although the Defendants assert that Nesbitt had a poor attitude

and was insubordinate, a reasonable juror could conclude that

Olscamp intended the statement to include Nesbitt's CC and email

to Chrencik complaining of Venuto's conduct.

Because Nesbitt has established a *prima facie* case of

retaliation, the burden of production shifts to the Defendants

to provide a non-discriminatory reason for their actions.

*Hoyle*, 650 F.3d at 336.   The Defendants carry this burden by

asserting that Nesbitt was terminated because of her

insubordinate emails to McCullom, her poor work performance, and

her insistence that nothing in the HR Department change under

Venuto.

Nesbitt has presented sufficient evidence that the reasons

provided by the Defendants are "unworthy of credence."  *See*

*Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir.

2007).   Nesbitt has provided a letter in which Olscamp praised

Nesbitt's performance and provided her a raise the day before

Nesbitt's email to Chrencik and only six days before her

termination.   This sufficiently casts doubt on Olscamp's

assertions that she had already decided to fire Nesbitt.  *See*,

*e.g.*, *Sears Roebuck*, 243 F.3d at 852-53.   This evidence,

34

combined with the comment that Nesbitt did not have the proper

attitude under Venuto, is sufficient to survive summary

judgment.

Accordingly, the Court will deny the Defendants' motion on

the retaliation claim.

D. Nesbitt's Breach of Contract Claim

Nesbitt alleges that the Defendants breached a contract[45]

with her by failing to follow BWMC's Personnel Polices Manual

and disciplinary policy.  ECF No. 29-2 at 17-18.

In Maryland, in the absence of an express employment

contract for a definite term, a plaintiff is an at-will

---

[45] "Maryland adheres to the principle of the objective
interpretation of contracts."[45]   *Cochran v. Norkunas,* 919 A.2d
700, 709 (Md. 2007).  "If a contract is unambiguous, the court
must give effect to its plain meaning and not contemplate what
the parties may have subjectively intended by certain terms at
the time of formation."[45]   *Nova Research, Inc. v. Penske Truck
Leasing Co., L.P.,* 952 A.2d 275, 283 (Md. 2008).  "It is a
fundamental principle of contract law that it is 'improper for
the court to rewrite the terms of a contract, or draw a new
contract for the parties, when the terms thereof are clear and
unambiguous, simply to avoid hardships.'"  *Calomiris v. Woods,*
727 A.2d 358, 368 (Md. 1999) (quoting *Canaras v. Lift Truck
Services,* 322 A.2d 866, 873 (Md. 1974)).

Courts must consider contracts "from the perspective of a
reasonable person standing in the parties' shoes at the time of
the contract's formation."  *Ocean Petroleum Co. v. Yanek*, 5 A.3d
683, 690 (Md. 2010); *see also Cochran v. Norkunas,* 919 A.2d 700,
709 (Md. 2007) ("[T]he true test of what is meant is not what
the parties to the contract intended it to mean, but what a
reasonable person in the position of the parties would have
thought it meant.") (quotation omitted).  "The language of a
contract is only ambiguous if, when viewed from this reasonable
person perspective, that language is susceptible to more than
one meaning."  *Ocean Petroleum Co.,* 5 A.3d at 690-91.

employee. *Hrehorovich v. Harbor Hosp. Ctr., Inc.*, 614 A.2d 1021, 1030 (Md. Ct. Spec. App. 1992). "[A]t-will employment is a contract of indefinite duration that can be terminated at the pleasure of either party at any time." *Id.* An employer can modify an at-will employment relationship "by the provisions of a personnel policy." *Hemphill v. Aramark Corp.*, 2014 WL 1248296, at *22 (D. Md. Mar. 25, 2014); *see also Elliott v. Bd. of Trustees of Montgomery Cnty. Cmty. Coll.*, 655 A.2d 46, 49 (Md. Ct. Spec. App. 1995) ("[A]n employee handbook may, in some circumstances, become an unilateral contract."). However, Maryland courts have been clear that 'an employer may avoid contractual liability by any terms which clearly and conspicuously disclaim contractual intent.'" *Scott v. Merck & Co., Inc.*, 497 Fed. Appx. 331, 335 (4th Cir. 2012) (quoting *Castiglione v. Johns Hopkins Hosp.*, 517 A.2d 786, 793 (Md. Ct. Spec. App. 1986)).

Here, the Employee Handbook and the disciplinary policy both clearly state that they were not intended to create a contractual relationship, and employees could be terminated at any time for any reason. Accordingly, the Court must grant the Defendants' motion on the breach of contract claim. *See, e.g., Hemphill*, 2014 WL 1248296, at *22 (finding employee handbook disclaimers "clear and unambiguous").

E. UMMS's Liability

Finally, the Defendants argue that UMMS cannot be held responsible for *any* of the conduct alleged because UMMS was not Nesbitt's employer.  ECF No. 68-1 at 59.  Nesbitt argues that Arthur, Benzer, Chrencik, Jozwik, Peters, McCullum, Olscamp, and Venuto were all UMMS employees.  *See* ECF No. 72-1 at 38.  The Defendants admit that these individuals were employed by UMMS,[46] but argue that this is not sufficient to establish that UMMS is liable.  ECF No. 74 at 30.

In support of their argument, the Defendants cite *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 980-82 (4th Cir. 1987), which discusses a company's liability for its subsidiaries actions.

> Under the doctrine of limited liability, a shareholder is not responsible for the acts of a corporation. The concept is expressed by the colorful metaphor of the corporate veil, which presumes that acts of the corporation are not acts of the shareholder. . . . Thus, when a subsidiary hires employees, there is a strong presumption that the subsidiary, not the parent company, is the employer.

*Id.*  "A plaintiff must, therefore, allege that the relationship between a parent and its subsidiary is '[some]thing more than a normal parent-subsidiary relationship.'"  *Betof v. Suburban Hosp., Inc.*, 2012 WL 2564781, at *5 (D. Md. June 29, 2012).

---

[46] In their motion for summary judgment, the Defendants admitted that "UMMS's executives are in charge of BWMC and BWMC's Vice Presidents are UMMS employees . . . ."  ECF No. 68-1 at 14.

"The integrated enterprise theory makes corporations liable for another corporation's actions when the corporations are closely connected." *Thomas v. Bet Sound-Stage Rest./BrettCo, Inc.*, 61 F. Supp. 2d 448, 455-57 (D. Md. 1999). "In determining whether sufficient integration exists to treat the corporations as a single, integrated "employer," the Court must weigh four factors . . . (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control." *Id.* "The first three factors are weighed more heavily than the last." *Id.* In *Thomas*, the district court summarized the evidence that courts have found probative in this analysis:

> (1) one company's employees hired and fired the other's employees and/or authorized lay offs, recalls, and promotions of such employees, *see Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1241 (2d Cir.1995); *Frank*, 3 F.3d at 1362; *Johnson*, 814 F.2d at 981; *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir.1983); (2) one company routinely transferred employees between it and the other company, used the same work force, and/or handled the other's payroll, *see Johnson*, 814 F.2d at 981; *Armbruster v. Quinn*, 711 F.2d 1332, 1338 (6th Cir.1983); (3) one company exercises more than general oversight of the other's operations by supervising the other's daily operations, such as production, distribution, purchasing, marketing, advertising, and accounts receivable, *see Cook*, 69 F.3d at 1241; *Johnson*, 814 F.2d at 981-82; *Armbruster*, 711 F.2d at 1338; (4) the companies have common management in the form of interlocking boards of directors and/or common officers and managers. *See Frank*, 3 F.3d at 1364; *Johnson*, 814 F.2d at 982; (5) the companies fail to observe basic formalities like keeping separate books and holding separate shareholder and board meetings,

> *see Johnson,* 814 F.2d at 981; (6) the companies fail
> to maintain separate bank accounts, *see Johnson,* 814
> F.2d at 982; (7) the companies file joint tax returns.
> *See Johnson,* 814 F.2d at 982.

*Id.* The court also emphasized that there is "low or no

probative value" to the fact that "the supervisors of the

subsidiary ultimately reported to officers in the parent

company, or that certain high level management employees perform

functions for both companies." *Id.*

Similarly, in *Depaoli v. Vacation Sales Assocs., LLC,* 425

F. Supp. 2d 709, 715-16 (E.D. Va. 2005), the plaintiff presented

evidence that the parent company and its subsidiary had common

officers and directors; occasionally intermingled personnel; and

had "an informal management fee" that allowed the subsidiary to

solicit policy advice from the parent company.  The court held

that this evidence was insufficient to establish that the parent

company was an integrated employer.  *Id.*.

Here, Nesbitt's only argument is that many of the people

involved were UMMS employees as well as BWMC employees.  She

never argues that she was a UMMS employee or attempts to

establish any of the factors detailed by the court in *Thomas*, 61

F. Supp. 2d at 455-57.  Accordingly, there is insufficient

evidence to establish UMMS's liability, and summary judgment

must be granted in its favor.

III. Nesbitt's Motion for Reconsideration

   A. Background

   On April 9, 2014, Nesbitt requested her medical records and employee health file from BWMC. ECF No. 56-1 at 1.  On April 22, 2014, BWMC produced the files.  *Id.*  However, on June 25, 2014, "the Defendants admitted, by and through the testimony of their employee Syma Rizvi, that several documents originally maintained and required to be maintained in [Nesbitt's] employee medical file were not included in the documents . . . ."[47]  *Id.* at 1-2.  On August 15, 2014, Nesbitt moved for sanctions and other appropriate relief based on the spoliation of evidence. ECF No. 56.  Nesbitt requested either summary judgment in her favor or adverse inference jury instructions.  ECF No. 56-1 at 9.

   On October 29, 2014, Judge Sullivan issued a letter order denying Nesbitt's motion for sanctions.  ECF No. 75.  Judge Sullivan noted that the facts supporting Nesbitt's motion "are drawn largely from the deposition testimony of Ms. Rizvi."  *Id.* at 1.  However, as shown by the Defendants, Judge Sullivan determined that Rizvi's testimony was not as certain as Nesbitt

---

[47] The allegedly missing documents are "(1) the progress notes of Syma Rizvi . . . who documented Plaintiff's vital signs, including blood pressure and heart rate; (2) medical records from Plaintiff's primary care physician relating to her blood pressure and recommended work restrictions; and (3) one of Plaintiff's FMLA forms."  ECF No. 75 at 1.

40

represented. *Id*. at 1-2  The evidence was unclear about whether "whether the missing records were actually stored in [Nesbitt's] Health File, or whether [] Venuto or his assistant ever actually accessed the Health File, let alone whether they removed records from it." *Id*. at 2.

Judge Sullivan assumed for the purpose of the motion that the Defendants had an obligation to preserve the Health File including the missing documents, but determined that Nesbitt's arguments were "exceedingly weak" and had not shown that the Defendants had a culpable state of mind. *Id*.  Further, Judge Sullivan concluded that Nesbitt failed to show the relevance of the missing records because there was no prejudice. *Id*.

B. Legal Standard

A district judge may refer nondispositive pretrial matters to a magistrate judge for hearing and determination.  28 U.S.C. § 636(b)(1).  Under Federal Rule of Civil Procedure 72(a), a district judge may "modify or set aside" the magistrate judge's order on a nondispositive pretrial matter if "any part of the order [] is clearly erroneous or contrary to law." *See also* L.R. 301.5(a) (D. Md. 2014).  "Under the clearly erroneous standard, the reviewing court is not to ask whether the finding is the best or only conclusion permissible based on the evidence.  Nor is it to substitute its own conclusions for that of the magistrate judge." *Huggins v. Prince George's Cnty.*, 750

41

F.Supp.2d 549, 559 (D. Md. 2010). Rather, the Court is "only required to determine whether the magistrate judge's findings are reasonable and supported by the evidence." *Id.* "It is not the function of objections to discovery rulings to allow wholesale relitigation of issues resolved by the magistrate judge." *Buchanan v. Consolidated Stores Corp.,* 206 F.R.D. 123, 124 (D. Md. 2002).

A party seeking sanctions for spoliation must prove that "(1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a 'culpable state of mind; and (3) the evidence that was destroyed or altered was 'relevant' to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it." *Goodman v. Praxair Servs., Inc.,* 632 F. Supp. 2d 494, 509 (D. Md. 2009) (quoting *Thompson v. U.S. Department of Housing & Urban Development,* 219 F.R.D. 93, 100-01 (D. Md. 2003).

C. Nesbitt's Motion

In her motion, Nesbitt "objects and seeks reconsideration of three findings made in the October 29, 2014, Order: (1) that the destruction or loss of the subject records was not

42

accompanied by a culpable state of mind; (2) that [Nesbitt] is not prejudiced by the destruction or loss of the subject records; and (3) that [Nesbitt] is not credited with having undertaken a good faith efforts to resolve the dispute."  ECF No. 77-1 at 2.

Nesbitt states the same arguments here that she did before Judge Sullivan.  Her motion in no way shows that Judge Sullivan's factual findings were clearly erroneous.  Instead, Nesbitt simply seeks "wholesale relitigation of issues resolved by the magistrate judge," which is not the purpose of this type of motion.  *Buchanan*, 206 F.R.D. at 124.  Accordingly, the Court will deny the motion for reconsideration.

III. Conclusion

For the reasons stated above, the Defendants' motion for summary judgment will be granted in part and denied in part. Nesbitt's motion for reconsideration will be denied.

_9/28/15_
Date

William D. Quarles, Jr.
United States District Judge